# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.                      **Case No. 09-40095-01-RDR**

LORENZO GUTIERREZ,

        Defendant.

---

## MEMORANDUM AND ORDER

This mater is presently before the court upon defendant's motion to suppress. The court has held a hearing and heard evidence and received exhibits. Having considered the arguments of the parties, the court is now prepared to rule.

The defendant seeks to suppress the evidence that was seized following a traffic stop on November 19, 2009. The defendant argues that the officers conducting the stop violated the Fourth Amendment because they exceeded the scope of his consent in allowing a search of his car.

*Findings of Fact*

1. On November 19, 2009, Kansas Highway Patrol (KHP) trooper Christopher Nicholas was on patrol on Interstate 70 in Waubaunsee County, Kansas. Trooper Nicholas has been a KHP trooper for nine years. At approximately 1:27 p.m., he noticed a gold Mercury Grand Marquis. Trooper Nicholas' patrol car was turning through the concrete median of I-70 when he saw the car. It attracted his

attention because (1) it had a large crack in the windshield, and (2) it was following another car too closely. He activated the emergency lights on his patrol car in an effort to pull the car over because he believed that two violations of Kansas law were present. The car immediately pulled to the side of the road. Trooper Nicholas' car contained a video camera that recorded the events of the stop.

2. Trooper Nicholas approached the car on the passenger side. The driver, who was the only person in the car, rolled down the front passenger window. Trooper Nicholas began to explain to the driver, who appeared to be Hispanic, why he had stopped him. He then asked the driver if he spoke English. The driver responded with a gesture the trooper interpreted to mean "a little." The trooper then sought confirmation by asking the driver if he meant "a little," and the driver nodded his head yes. Trooper Nicholas then continued to explain why he stopped him. He mentioned the cracked windshield and that he was following too closely. He explained following too closely by counting "one-thousand one, one-thousand two." The driver indicated that the crack in the windshield had been caused by a rock from a trailer he had been following.

3. As Trooper Nicholas stood at the passenger window, he smelled fresh automotive paint. Trooper Nicholas had worked in an automotive body shop prior to working for the KHP, so he was

familiar with the smell of fresh automotive paint. Trooper Nicholas asked the driver for his license and asked him if the car belonged to him. The driver answered that the car did belong to him. He provided Trooper Nicholas with his driver's license and the car's registration. Trooper Nicholas noticed that the driver's hands were shaking "pretty good" as the documents were handed to him. Trooper Nicholas found this to be sign of nervousness. The driver's license indicated that the driver was Lorenzo Gutierrez.

4. Trooper Nicholas asked Gutierrez where he was going and eventually determined that he was saying "Louisville, Kentucky." Gutierrez spoke in broken and halting English, but he appeared to understand most of the questions asked by Trooper Nicholas. Gutierrez indicated he was going there to work and would be there approximately one week. During this conversation, both the driver's side window and the front passenger window were down. The noise of passing traffic appeared to hinder the ability of Trooper Nicholas and Gutierrez to hear each other. Trooper Nicholas told Gutierrez that he could roll up the driver's side window, which he did. The trooper sought to identify the source of the fresh automotive paint. Trooper Nicholas believed that the smell was coming from inside the car. Trooper Nicholas then told Gutierrez that he did not plan to write him a ticket.

5. Trooper Nicholas returned to his patrol car. As he entered his patrol car, he noted aloud that he smelled fresh automotive

paint.   After another officer mistakenly called him, Trooper Nicholas told him that he might need him "in a minute."  He then sought checks on the license and the registration and then requested if the driver had any wants or warrants.   Trooper Nicholas then examined the car's registration.   He noted the car had been recently purchased on November 6, 2009, and the license plates had been purchased on November 12, 2009.   He also noted a different address on the registration.   He found this information "odd."   He received information from his dispatcher that the license and registration were accurate and that there were no current wants and warrants.   Trooper Nicholas prepared a warning ticket and returned to Gutierrez' car.

6. Trooper Nicholas once again approached the passenger front window.   He asked Gutierrez if he had proof of insurance. Gutierrez provided it.   It showed a purchase date of November 10, 2009.   Trooper Nicholas returned all of the documents to Gutierrez. He then told Gutierrez to have a safe trip.   He began to walk back to his patrol car.   He then stopped, turned around and asked Gutierrez if could ask him a few more questions.   Gutierrez nodded his head and said, "yes."   Trooper Nicholas asked him if he was headed to Kentucky to work.   Gutierrez answered "yes."   Trooper Nicholas then asked him if he needed to call anyone when he got there.   Gutierrez did not appear to understand the question. Trooper Nicholas then told Gutierrez that he smelled fresh paint

and asked him if he had done any work to the car. Gutierrez said "no." Trooper Nicholas asked him if he had anything illegal in the car such as guns, weapons or drugs. Gutierrez responded that his "hardware" was in the back. Gutierrez then indicated that he did not have any of the items noted by the trooper. During this encounter and the previous conversations with Gutierrez, Trooper Nicholas noticed that Gutierrez had avoided eye contact. He further noticed that the key in the ignition was on a ring with only one other key. He thought the circumstances of the key ring were "kind of odd." He asked Gutierrez for consent to search the car. Gutierrez nodded his head yes. Trooper Nicholas asked him if that meant yes, and Gutierrez verbally answered "yes." The court finds that Trooper Nicholas and Gutierrez were able to communicate sufficiently in English. Gutierrez had some difficulties understanding some of Trooper Nicholas' questions, but he appeared to understand most of what was discussed. He specifically appeared to understand that he was consenting to search of his car. He appeared sufficiently intelligent to understand the situation. There was no evidence of threats or coercive tactics. Trooper Nicholas did not display his weapon or use a commanding manner or tone of voice.

7. Trooper Nicholas told Gutierrez to turn the car off and hand him the keys. Gutierrez did so. Trooper Nicholas asked Gutierrez to step out of the car. Gutierrez got out of the car and

Trooper Nicholas performed a quick pat down search for officer safety. Trooper Nicholas asked him if he had any weapons and Gutierrez said no. Trooper Nicholas then asked how much money he had and Gutierrez said "300." Trooper Nicholas told him to wait down in the ditch.

8. Trooper Nicholas began searching the trunk of the car. As he started his search, Deputy Brian Rhodd of the Shawnee County Sheriff's Department arrived on the scene. Both officers began to examine the car. Trooper Nicholas told Deputy Rhodd he had smelled fresh automotive paint. Trooper Nicholas noted that the carpet appeared to have been pulled up under the area of the driver's seat, the seat was loose, and that extra screws were laying on the floor in that area. Deputy Rhodd examined the passenger side of the front seat and confirmed that he could smell the paint odor that Trooper Nicholas had noted.

9. Trooper Nicholas opened the hood of the car. He immediately noticed that the heater hoses had been removed and had not been reattached. Trooper Nicholas found this particularly suspicious since this meant that the car had no heat, which was certainly unusual for an automobile trip in November. The car did, however, have a separate heater in the passenger compartment. Trooper Nicholas pointed out the heater hose matter to Deputy Rhodd, who indicated that he was familiar with this model car having a history of concealed compartments in the firewall area.

He pointed out that the screws that held the cowl panel down between the windshield and the hood showed fresh tool marks and there were fresh scratches on the windshield wipers. These marks and scratches were consistent with the windshield and the cowl panel having been recently removed. Trooper Nicholas noted that the cowl panel is only removed to install a windshield.

10. Trooper Nicholas found that the smell of fresh paint was coming from the hinge area of the passenger side front door. He also found a piece of broken glass in the floorboard of the vehicle and observed that some of the carpet in the front floorboard area was wet. He then pried up the cowl panel. He saw body filler at the base of the windshield. Body filler is not usually found in that location. He was aware that body filler is used to secure access doors to concealed compartments. He also noted that the windshield was being held in place with butyl tape rather than the standard adhesive. He determined that all of these circumstances were consistent with a hidden compartment.

11. During this period, Gutierrez made no effort to revoke his consent or in any way object or clarify the scope of his consent to search. He stood only a few feet from the car, but he did not express any concern about the efforts of the law enforcement officers to search his car.

12. Trooper Nicholas removed the windshield wipers. He also removed the cowl panel. He believed that the crack in the

windshield had occurred when someone had removed it. He called for assistance in removing the car to another location. Trooper Nicholas then began to ask Gutierrez whether work had been done on the car and whether there was a compartment. Gutierrez again claimed not to have done any work on the car. Gutierrez was then handcuffed and placed in the back of Deputy Rhodd's patrol car. The car was later removed to another location. The windshield was removed and five kilograms of powder cocaine were found in a hidden compartment below the windshield.

*Conclusions of Law*

1. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. A traffic stop is a Fourth Amendment seizure "even though the purpose of the stop is limited and the resulting detention quite brief." Delaware v. Prouse, 440 U.S. 648, 653 (1979). A traffic stop is permissible under the Fourth Amendment if "the officer has a reasonable articulable suspicion that a traffic . . . violation has occurred or is occurring." United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998).

2. An officer conducting a traffic stop may request a driver's license, vehicle registration, run a computer check, and issue a citation. See United States v. Zubia-Melendez, 263 F.3d 1155, 1161 (10th Cir. 2001). Once an officer completes these tasks, the

officer must allow the driver to proceed on his way without being subject to further delay by police for additional questioning.  See id.; see also United States v. Edgerton, 438 F.3d 1043, 1047 (10th Cir. 2006).  Absent a consensual encounter, further detention for purposes of questioning unrelated to the initial traffic stop is permissible if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring.  See Zubia-Melendez, 263 F.3d at 1161.  Reasonable suspicion exists where an officer has a "particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002).  We determine whether reasonable suspicion exists from the totality of the circumstances.  See id.

3.  "In determining whether a driver and police officer are engaged in a consensual encounter in the context of a traffic stop, there are few, if any, bright-line rules."  United States v. Elliott, 107 F.3d 810, 813 (10th Cir. 1997).  Rather, we must consider "the totality of the circumstances in a particular case." Id. at 814.  While the return of documents, such as a driver's license or other personal papers, is a prerequisite to an encounter becoming consensual, the Tenth Circuit has acknowledged it "is not always sufficient to demonstrate that an encounter becomes consensual."  Id.; see also United States v. Gregory, 79 F.3d 973, 979 (10th Cir. 1996).  Accordingly, even after the officer returns a driver's papers, the encounter may not be consensual where "there

was evidence of a 'coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled.'" <u>Elliott</u>, 107 F.3d at 814 (quoting <u>United States v. Turner</u>, 928 F.2d 956, 959 (10th Cir. 1991)).  However, the ultimate test is whether "a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information." <u>United States v. McKneely</u>, 6 F.3d 1447, 1451 (10th Cir. 1993).

4. The defendant does not dispute that (1) the traffic stop was legitimate, (2) Trooper Nicholas properly conducted the stop, (3) a consensual encounter occurred following the completion of the traffic stop, and (4) he consented to a search of his car.  The court agrees that the record supports all of these issues.

5. The defendant argues that Trooper Nicholas exceeded the scope of his consent to search the car.  He contends that Trooper Nicholas' actions in damaging his car exceeded the scope of his consent.  He further asserts that he could not object to the search because he had been handcuffed and placed in the back seat of the patrol car.  Finally, he notes that his inability to speak English further prevented objection to the search.

6. The determination of whether a search remains within the boundaries of the consent is a question of fact to be determined from the totality of the circumstances. <u>United States v. Kimoana</u>,

383 F.3d 1215, 1223 (10th Cir. 2004). "The scope of a search is generally defined by its expressed object," <u>Florida v. Jimeno</u>, 500 U.S. 248, 251 (1991), and "is limited by the breadth of the consent given," <u>United States v. McRae</u>, 81 F.3d 1528, 1537 (10th Cir. 1996) (citation omitted). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?" <u>Jimeno</u>, 500 U.S. at 251.

7. The defendant has suggested, relying on <u>United States v. Osage</u>, 235 F.3d 518 (10th Cir. 2000), that the officers needed to obtain specific consent from him prior to the removal of any parts from the car. We disagree and find <u>Osage</u> distinguishable here. In <u>Osage</u>, an officer opened a can of tamales found in a suitcase after he had been granted consent to search the suitcase. The Tenth Circuit found that the search had exceed the scope of consent because the opening of the can destroyed or rendered it useless. <u>Osage</u>, 235 F.3d at 521. Relying on <u>Jimeno</u>, the Tenth Circuit held that "before an officer may actually destroy or render completely useless a container which would otherwise be within the scope of a permissive search, the officer must obtain explicit authorization, or have some other, lawful, basis upon which to proceed." <u>Id</u>. at 522.

The court is not persuaded that <u>Osage</u> is applicable. The

actions of the officers here did not destroy the car or render it useless. The parts that were removed could have been reattached. Moreover, as the court will discuss in greater detail below, the officers obtained probable cause to search the car prior to the removal of any of the parts of the car. See United States v. Carbajal-Iriarte, 586 F.3d 795, 802-03 (10th Cir. 2009) (immaterial whether defendant had consented to cutting open the upholstery of a seat in his car after officers obtained probable cause to search the seat).

8. The court does not find that Trooper Nicholas exceeded the scope of the consent to search. The consent led Trooper Nicholas and Deputy Rhodd to conduct a thorough search of the car. This search led them to a variety of circumstances that suggested the presence of a hidden compartment. They took no steps to dismantle any portion of the car until they had probable cause to believe that a hidden compartment existed. "[V]isual evidence of a hidden compartment, without more, may provide probable cause to conduct or expand a search." United States v. Ledesma, 447 F.3d 1307, 1317 (10th Cir. 2006). Two requirements are necessary to establish probable cause: (1) "the likelihood that there really is a hidden compartment," and (2) "the likelihood that a vehicle with a hidden compartment would, in the circumstances, be secreting contraband." United States v. Jurado-Vallejo, 380 F.3d 1235, 1238 (10th Cir. 2004). In Jurado-Vallejo, the Tenth Circuit noted the second

factor is easily met when common sense dictates a particular vehicle's hidden compartment would be highly likely to contain contraband. Id. at 1238-39.

9. Trooper Nicholas and Deputy Rhodd found a number of circumstances that suggested the presence of a hidden compartment. They did not actually begin to dismantle the car until there was strong likelihood that a hidden compartment was present. They had discovered (1) the smell of fresh automotive paint, (2) carpeting that had been pulled up, (3) a loose seat, (4) extra screws lying on the floor, (5) screws that held down the cowl panel showed fresh tool marks, (6) fresh scratches on the windshield wipers, and (7) heater hoses that had been removed and not reattached. At this point, Trooper Nicholas pried up the cowl panel and saw body filler at the base of the windshield. He also noted that the windshield was being held in by butyl tape. Deputy Rhodd was familiar with information that this model of car had previously been found to have hidden compartments in the area of the firewall beneath the windshield. The actions by Trooper Nicholas and Deputy Rhodd in prying up the cowl panel did not exceed the scope of the defendant's consent. The Tenth Circuit has indicated previously that some dismantling of a car during a traffic stop following consent to search is appropriate. United States v. Marquez, 337 F.3d 1203, 1209 (10th Cir. 2003) (consent to search vehicle includes partial dismantling of automotive components); United States v.

<u>Pena</u>, 920 F.2d 1509, 1512-15 (10th Cir. 1990) (consent to search allowed officers to remove rear quarter panel vent and piece of cardboard under it following discovery of other suspicious circumstances such as loose and missing screws and tool marks). Moreover, during this period, Gutierrez was standing in the ditch close to the car. He clearly could have objected to the actions of the officers, but he did not do so. "The general rule is that where a suspect does not limit the scope of a search, and does not object when the search exceeds what he later claims was a more limited consent, an officer is justified in searching the entire vehicle." <u>United States v. West</u>, 219 F.3d 1171, 1177 (10th Cir. 2000) (quotation omitted). There is no evidence that Gutierrez objected to or expressed concern about the officers' activities or that he attempted to limit or retract his consent. See <u>Pena</u>, 920 F.2d at 1515.

10. Once Trooper Nicholas observed the body filler along with the other circumstances, he had probable cause to believe that the car had a hidden compartment. This certainly allowed some dismantling and also allowed removal of the car and a continuation of the search, even if there was no consent to move the vehicle and continue the search.

11. Accordingly, the court finds no merit to the arguments of the defendant. The motion to suppress must be denied.

**IT IS THEREFORE ORDERED** that defendant's motion to suppress

evidence (Doc. # 11) be hereby denied.

**IT IS SO ORDERED.**

Dated this 30th day of March, 2010 at Topeka, Kansas.

                                   s/Richard D. Rogers
                                   United States District Judge